# SUPERIOR COURT OF BALTIMORE CITY.

Filed November 24, 1911.

MARGARET McCAFFERTY
VS.
THE UNITED STATES LIFE INSURANCE COMPANY OF NEW YORK.

*Isaac Lobe Straus* and *Joshua Horner, Jr.*, for plaintiff.

*Albert Ritchie* for defendant.

GORTER, J. (Orally)—

Now gentlemen, I have endeavored to keep my mind open, so as to reach, as correctly as I might be able, the law that would be applicable and control this case. I have certainly done so, because I was not able to reach a conclusion as to how I ought to decide it, until I had to reach a conclusion. Whether my conclusion is right or wrong can very easily be determined, with comparatively little expense, by the higher court, which, after all, is the tribunal that makes the law.

The case was very fully argued, and I wanted it to be very fully argued; because it seemed to me to be a very important one, but after the argument the case really reduced itself to a very narrow compass, and the learned counsel for the plaintiff it seemed to me, al-

most, if not entirely, stated the sphere within which it stood.

I think that this is not a case as to whether or not the defendant furnished something for which the plaintiff did not ask, and, therefore, that there was a mistake and no contract. In my judgment, if that were all, it would be a question that undoubtedly, under the evidence in the case, should go to the jury. But what I think the case is, is this: Conceding that the plaintiff got a policy different from the one that he expected to get, and one which the agent of the company said he would get, he has not, by holding on to that policy for twenty years, accepted by his conduct the terms and conditions which the company made in the policy itself? Now, that is the case.

In other words, can a man take a policy which he could read in fifteen or twenty minutes, although the agent has told him it is something different from what he really gets, and can he keep that policy for twenty years without reading it, and after he had had his insurance for twenty years, during any time wherein, if he had died, the policy would have been paid; and then at the end of twenty years read it and say, This is not what I wanted; this is not what I contracted to get; now, I don't want it; it was a mistake; I was induced to take it by the misrepresentations of the agent, and I ask the company to hand me back my money, with interest? That seems to me to be this case. Can a person do that in law?

I have been referred to the Minnesota case—the strongest case for the plaintiff—and in that, the application was made, if my recollection is correct, six weeks after the policy was delivered. I rather think the Bostwick case, the one which I have before me, was six months after the policy was delivered, and the McMaster case was a year after the policy was delivered.

In the first and in the last, the plaintiff was allowed to recover; in the second, one of the plaintiffs was allowed to recover, but the other two were not allowed to recover. We see what tremendous resistance was offered by the company and the doubt that existed in the minds of the court in those cases, even to allow the recovery to be had.

We have not a case like those before us now. We have a case in which the plaintiff waited twenty years, during all of which time he was insured, and then at the end of the twenty years he realizes, or wakes up to the fact that what he has, was not what he claims he contracted to get; his chief disappointment is that he does not get the $5,500, but only less than half of that amount, when he thought that the policy which he had, according to his testimony, guaranteed him the $5,500.

From the reading of the cases and the principles involved, I have reached the conclusion that the law will not allow him to do that. Reading from page 748 of the opinion of the Wisconsin Supreme Court, Bostwick against the Mutual Insurance Company; "Those principles apply with great force to this class of cases. The respondent had the full benefit of his insurance for nearly a year before he repudiated the transaction, and his assignees had the benefit of theirs for months before they acted in that regard. The entire period covered by the first premium upon respondents' policy had, before he refused to abide by such policy nearly expired. No one would venture to claim that, if he had died during such period of delay, the company would not have been bound by the policy, and his personal representatives would not have enforced it.

During all that time the money paid by respondent for his policy formed a part of the fund relied upon by the other policy holders for their protection, part of the assets of the company upon which all its operations were based. It was not guilty of any moral turpitude except by imputation. Its officers were not guilty of any wrongdoing whatever. They supposed, and had a right to suppose, for months, that the company's soliciting agent acted honestly in obtaining the applications for the policies. They knew that the policies issued, received and retained, were in strict accordance with the applications. They carried the risk assumed on their books as part of their liabilities and the premiums paid, as before indicated, as part of their assets. All the policy holders of the company were interested in the fund of which the money sought to be recovered formed a part, and many of which, we may rightly assume, joined the company during the period of delay."

Again on the next page I read:

Mr. Ritchie. Is your Honor reading from 67 L. R. A.?

The Court: Yes, from page 748. Now I am going to read from page 749. "A diligent attention to one's own concerns, as well as good faith to others, is a virtue; and the law, while it recognizes the rules which tend to preserve the latter, at the same time is careful to guard the principles which prompt to the exercise of the former. With respect to points plainly within the reach of every man's observation and judgment, and where an ordinary attention would be sufficient to guard against imposition, the want of such attention is, to say the least. an inexcusable negligence. To one thus supinely inattentive to his own concerns, and improvidently and credulously confiding in the naked and interested assertions of another. the maxim, Vigilantibus, et non dormientibus. jura subveniunt. emphatically applies, and, opposes an insuperable objection to his obtaining the aid of law."

Now, again on the next page, 750, I read: "If he rescinds on the ground of fraud, he must do so at once on discovering the fraud. Any delay, especially if it be injurious to the other party, would be regarded as a waiver of his right. The mere lapse of time, if it be considerable, goes far to establish a waiver of this right, and if it be connected with an obvious ability on the part of the defrauded person to discover fraud at a much earlier period. by the exercise of ordinary care and diligence, it would be almost conclusive."

Again, I read at the bottom of page 751: "Constructive notice was not formerly held to be under any circumstances a 'cover for fraud.' It was held to be evidence of assent, regardless of the fraud, or, if not such, of inexcusable negligence, waiving judicial remedies for fraud, and not apparent mere assumption, but upon the authority of this court's previous decisions, and of most other courts."

Therefore, gentlemen, not without considerable doubt and hesitation. I have reached the conclusion that if a party keeps a policy for the length of time Mr. McCafferty did, he has in law assented to the terms of that policy, and he can not come into a court and ask the court to relieve him from the position that he is in. His neglecting the serious obligation of reading the policy that insured his life has lost him that right, notwithstanding he may have relied upon the statement of the company's agent as to the terms of the policy. Now that is the best conclusion that I have been able to reach.

On the other hand, I do see that the other side, in the prospectus which has been handed out, represented something which has distressingly failed to come up to the expectations of the insured. The criticisms that have been made upon the slip which was attached to the policy have some foundation and support. But notwithstanding that, I think that the plaintiff by his conduct under the law as I get it from these cases, and under the law as it seems to me it must be, is precluded from recovery in this case.

I have realized that the certainty and the stability that is given to written contracts is one of the safeguards of commercial transactions—that, if you can get away from it in a $5,000 policy, you can get away from it in a $100.000 policy; and, if you can get away from it in a $100.000 policy, you can do it in contracts which may run up into $500,000 or a $1,000,000, possibly—not that they are matters of any more interest to the people concerned in them than the $5,000 is to Mr. McCafferty: because a small amount to the man who hasn't much is of as much interest to him as the large amount is to the men who have much more. Still, I believe that that principle in the main gives us more stability in business, and enables us to prosper and progress more, than a rule which will enable a person, after a considerable length of time, although induced by fraud, to repudiate a contract which he has, printed, in his possession.

So I feel that I will have to grant the motions of the defendant and the prayers.

Mr. Straus. Do you grant the motion to strike out the evidence?

The Court. Yes.

Mr. Straus. You grant that?

The Court. Yes, I might as well grant them all in order to give you every possible exception; I might as well give you everything, so that you can have your decks cleared for action. I don't see that that prejudices you at all in that regard.

Mr. Ritchie. Before you come to the form of the verdict I want to say a word, because this is a case under a special statute, and there is a special case which deals with the proper form of the verdict in this case.

The Court. I will come back to you. Now, gentlemen, ordinarily, I think, that courts in taking a case away from a jury, just grant the prayer and say nothing; but I am going to try to explain the case to you, because you are here and are a part of the administration of justice, and have a very important function to perform; and I would like you, therefore, to understand the nature of the case that you have listened to so patiently.

It is not my duty to make the law. What I have said is not what I may think; it is what I think the law is, from these cases which these gentlemen have been reading to me for the last two or three days. If I am wrong the Court of Appeals, at Annapolis, at a very little cost, for this (indicating) is all the record consists of, will reverse me and send the case back to be tried by a jury. If I am right, they will let my rulings stand, because such is the law of Maryland, and we are all bound by it.

Now, I have said this: I have said that this is not a case to go to the jury, and I want to illustrate that to you gentlemen. If you gentlemen all take out an insurance policy for $5,000, the twelve of you, and you pay a premium of $150 a year and it is a twenty year policy, you each pay in about $3,100, and with 6 per cent. interest on. your money, it will make $5,000, and so, if you all live, there will be $60,000 to be divided among you twelve gentlemen, and you will each get $5,000 back, which is the amount of this policy, which, it is estimated would be returned. I make it even figures, because my calculations would be more difficult if I went into the hundreds.

That is all right if you all live, but if you, Mr. Foreman, the gentleman next to you, and the two gentlemen back of you, were to die the first year after the policy is taken out, you all will not have $60,000, because you four will not put in your respective amounts; and each of your families will get $5,000. Therefore, you would take. away from that fund of $60,000 the $20,000 which you have not put in,

and the $20,000 which your families take out, and there would be left for you gentlemen who live beyond the twenty years a fund of $20,000, to be divided equally among you, and each of the eight will get $2,500.

That is a plain proposition. But suppose the next four gentlemen say, "Why, the agent told me I was going to get $5,000, and here the company only gives me $2,500, and I believed him, and he made a fraudulent representation that that was in my policy, and when I got my policy I put it in the drawer, and I did not look at it; it stated that it was only estimated; but I did not look at it; and he told me I was going to get $5,000, and I would not have gone into it if I had known that I was not going to get my $5,000 back; I am going into a court of law and ask the court of law to give me back my $5,000." Each one of you say that and you come into a court of law and you say the agent told you that. The other side would say, "Why, gentlemen, why didn't you read your policy?" "Oh," you say, "I depended upon what the agent said; he lulled me into a feeling of security and whenever he met me. he would call me 'lucky boy,' and tell me how much I was going to get, and I did not take the trouble to read the policy." And the court and jury give you back $5,000 each.

Now, what are the other four gentlemen on the end to get? No money left. They say, "We did read our policy; we understood that the insurance was not going to anybody, except for protection for their wives and families; when you come to say insurance is an investment, that each of your families can have that amount, we know better; we know we are young men and that we may die, and while we are getting our salaries we are willing to pay you a part of our salaries to protect our wives and children in case we die; and we did read our policies; we do understand our policies; we know that if everybody had lived, we would have gotten $5,000; we know that if the company was fortunate enough to buy land out west at $2 an acre and later sell it for $200 an acre, we would get more than that; but, in the ordinary course of business, knowing the company could not ordinarily do better than 6 per cent., we thought, very well; although they told us we would get

$5,000, as thoughtful men reasoning out the transaction we have entered into, we only really expected to get, if we live, about $2,500, because that is about what we would reasonably expect to receive, and we want our $2,500." The insurance company would say: "We haven't it to give you: the other four gentlemen, who did not read their policies, who did not take the trouble to read theirs—a jury and a judge have given them all the money and, therefore, you gentlemen who read your policy and understood the transaction get nothing. We haven't any money to give you."

Now, I think that principle runs through all the insurance companies, if they are honestly conducted. You need not expect, if you give a verdict against an insurance company, that you are going to get any of Mr. Pierpont Morgan's money, or Mr. Rockefeller's; you are going to get the money of the other gentlemen on the jury, or of other people like yourself, who are struggling to make the world move, and who send their money on to the insurance companies; what you get is the money of the other people who are insured.

For these reasons I believe the law compels me to say that, taking all the evidence in this case, the law is—and I must tell you what it is as I understand it to be, and if I am wrong there is a court above me to correct me—the law is that I must instruct you to bring in your verdict, I will say, for the defendant.

But I am going to hear them. The defendant has put in the court this twenty-two hundred or twenty-three hundred dollars, and now I am going to hear the lawyers as to how they think your verdict ought to be rendered. When you give your verdict, there is a higher court that will review what I have done, so that you need not feel you are guilty of an injustice to anyone, no matter what your views may be.

Mr. Straus: Exceptions are reserved by the plaintiff to all the rulings of the court, both as to motions and to prayers, and we reserve an exception as to the form of verdict.

The jury assessed the damages at $2,256.95, the amount paid into court. The verdict as found was rendered under the direction of the court.